NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

In re the Marriage of:

MICHELE BUTLER, *Petitioner/Appellant/Cross-Appellee*,

*v.*

THOMAS BUTLER, *Respondent/Appellee/Cross-Appellant*.

Nos. 1 CA-CV 16-0442 FC
1 CA-CV 17-0479 FC
(Consolidated)

FILED 10-30-2018

Appeal from the Superior Court in Mohave County
No. L8015DO201107266
The Honorable Doug R. Camacho, Judge *Pro Tempore*

**AFFIRMED IN PART; VACATED IN PART; REMANDED**

COUNSEL

Mandel Young PLC, Phoenix
By Taylor C. Young
*Counsel for Petitioner/Appellant/Cross-Appellee*

Law Offices of Heather C. Wellborn, P.C., Lake Havasu City
By Heather C. Wellborn
*Counsel for Respondent/Appellee/Cross-Appellant*

---

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Chief Judge Samuel A. Thumma joined.

---

**W I N T H R O P**, Judge:

**¶1**        Michele Butler ("Wife") appeals the family court's June 2016 dissolution decree, arguing the court abused its discretion in (1) awarding spousal maintenance to Thomas Butler ("Husband"), (2) finding that Arizona Emergency Medical Specialists ("AEMS") and M.P. Butler, D.O., P.L.L.C. ("MP Butler") were separate businesses for valuation purposes, and (3) failing to credit Wife for expenses paid on the home awarded her ("the Remuda home"). Husband cross-appeals, arguing the court erred in (1) not considering the possibility Wife might short sell the Remuda home, and (2) failing to address the community interest in excess distributions above reasonable compensation regarding AEMS and MP Butler. For the following reasons, we vacate the award of spousal maintenance and remand for reconsideration of that issue, but otherwise affirm.

**FACTS AND PROCEDURAL HISTORY**

**¶2**        In 1994, the parties married in Colorado. By that time, each had a college degree and was employed. While married, they had two children—a son born in February 1998, and a daughter born in February 2004. Between 1995 and 1999, the family lived in Iowa, where Wife attended medical school. After she graduated, the family moved to Michigan, where Wife completed her residency in emergency medicine. In 2003, they moved to Lake Havasu, Arizona, where Wife began working as an emergency room physician.

**¶3**        While Wife was in medical school, she took out loans and worked part-time, and Husband worked various jobs. When Wife began her residency, Husband decided to stay at home to care for their son, while working part-time from home selling mortgages, which he continued to do after the family moved to Arizona.

**¶4**        The family moved to Phoenix in 2005, and then back to Lake Havasu in 2006 after Wife received the opportunity to join AEMS,

eventually as a partner/shareholder. Wife was to be paid as an independent contractor, and she formed MP Butler as a tax strategy. Wife also became part-owner of Large Bore Investment Group, L.L.C. ("Large Bore"), an entity formed in 2007 that held real property and depreciating fixed assets but had little or no ordinary income. Meanwhile, Husband briefly became a partner in a Taekwondo studio.

¶5 In 2009, after the real estate market crashed, the family purchased two homes in Lake Havasu ("the Lakeland home" and "the Holly home") as investment properties free and clear: the purchase price for the Lakeland home was $56,900, and the purchase price for the Holly home was $35,000. The parties' plan was for Husband to renovate the properties and either sell them or maintain them as rental properties, although at the time of the decree, the properties continued to be held and were not occupied.

¶6 In August 2011, Wife petitioned for dissolution of the parties' marriage. At around the same time, the parties evenly divided the money in their bank accounts, with each receiving approximately $60,000. Wife moved out of the family's primary residence ("the Oakwood home") in September 2011, taking very little with her, while Husband continued to live in the Oakwood home. Temporary orders awarded the parties joint legal and physical custody of the two minor children, and they exercised substantially equal parenting time.

¶7 Over the next year, Wife voluntarily paid Husband $50,000 in spousal support and paid all community expenses, including the mortgage and expenses for the Oakwood home. Based on evidence provided, in August 2012, the family court (Judge Richard Weiss) entered temporary orders requiring Wife to pay Husband $6,000 per month in spousal maintenance and $1,000 per month in child support, and to continue paying all community expenses, except those related to the Oakwood home. Wife made those court-ordered payments. Thus, for the nearly five years that elapsed between the time Husband was served with the petition for dissolution (on August 4, 2011) and the decree was entered (on June 14, 2016), Wife paid Husband a total of $314,000 in spousal maintenance.

¶8 Meanwhile, between August 2011 and October 2014, Husband did not seek or obtain gainful employment and used spousal maintenance to cover his expenses. Between August 2012 and January 2014, Husband was enrolled in school, earning a Master's in Business Administration ("MBA"). Ten months later—in October 2014—he obtained

a job working at a bank, where, at the time of trial, he was earning $11.54 per hour, or approximately $24,000 per year.

¶9             Trial, which began in November 2015, included seven days of testimony and argument, ending in April 2016.

¶10           On June 14, 2016, the court entered a fifty-five-page dissolution decree. By that time, the parties' son had reached the age of eighteen, leaving only the daughter as a minor child. The decree awarded the parties joint legal decision-making authority and ordered that Wife pay Husband $580 per month for child support. The decree also ordered Wife to pay Husband $8,000 per month in spousal maintenance until May 31, 2022.

¶11           In dividing the parties' assets, the decree concluded that almost everything owned by the parties, except a $165 fish finder, was a community asset. Husband received the Lakeland, Holly, and Oakwood homes, which valued at $115,000, $50,000, and $38,541.74 ($265,000 less a mortgage balance of $226,458.26), respectively. Husband also received community vehicles and boats valued at $64,515, bank accounts worth $291,477.81, and personal property valued at $13,618. The total value of community assets and property awarded Husband, after subtraction of the Oakwood home's mortgage, was $573,152.55. This amount was in addition to the $60,000 in cash he received upon the parties' separation and the $314,000 Wife had paid in voluntary and court-ordered spousal maintenance pending the divorce.

¶12           Wife received the parties' home in Peoria (the Remuda home), which had negative equity of -$251,486.56 (a $260,000 valuation less two outstanding mortgages totaling $511,486.56). Wife also received a community vehicle and two wave runners valued at $11,880, bank accounts worth $38,442.78, and personal property valued at $350.

¶13           The family court agreed with Husband's business valuation expert, Lynton Kotzin, that AEMS, MP Butler, and Large Bore should be valued as separate community businesses and valued the community interest in each at $545,000, $468,162, and $100,691 respectively, all as of December 31, 2011.[1] Ostensibly because Husband had received most of the

---

[1]       In valuing the parties' assets and debts, the court primarily used a valuation date of August 4, 2011—the date Husband was served with the dissolution petition—but used this somewhat different date for these assets

other property, the decree awarded Wife the community's interest in these businesses. The decree also ordered Wife to pay her remaining student loan debt of $133,997.70, and credited Wife for some of the community expenses she paid during pendency of the petition. The decree also ordered that Wife pay Husband's attorneys' fees and costs in the amount of $40,000, in addition to $7,500 in attorneys' fees the court had previously ordered Wife to pay.

¶14 Wife filed a timely appeal, and Husband cross-appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12-2101(A)(1), (2), and 5(a).

## ANALYSIS

¶15 Wife raises three issues on appeal, and Husband raises two issues on cross-appeal. Although Husband provides many citations to the record, he fails to provide record support for numerous factual assertions on which he relies for his arguments, despite the requirement of our appellate rules that he do so. *See* ARCAP 13(a)(7)(A)-(B). Even though Husband's failure to properly cite the record may constitute waiver as to the issues addressed in his brief, *see Delmastro & Eells v. Taco Bell Corp.*, 228 Ariz. 134, 137 n.2, ¶ 7 (App. 2011), we will consider the merits but rely on our own examination of the record.

### I. General Standards of Review

¶16 Unless demonstrated otherwise by clear and convincing evidence, property acquired during marriage is usually presumed to be community property. *See* A.R.S. § 25–211(A) (providing that, with certain exceptions, "[a]ll property acquired by either husband or wife during the marriage is the community property of the husband and wife"); *Cockrill v. Cockrill*, 124 Ariz. 50, 52 (1979). In general, a court shall divide community property equitably, although not necessarily in kind. A.R.S. § 25-318(A). When dividing property, a court may also consider all related debts and obligations. A.R.S. § 25-318(B). As a general presumption, equitable division requires that community property be divided substantially equally. *See Toth v. Toth*, 190 Ariz. 218, 221 (1997).

¶17 We view the facts and reasonable inferences in the light most favorable to sustaining the family court's rulings and will affirm if

given the evidence presented by the parties at trial. *See Sample v. Sample*, 152 Ariz. 239, 242-43 (App. 1986) (holding that the selection of a valuation date rests within the wide discretion of the family court).

reasonable evidence supports the court's decisions. *See Mitchell v. Mitchell*, 152 Ariz. 317, 323 (1987); *Thomas v. Thomas*, 142 Ariz. 386, 390 (App. 1984). Although we defer to the court's factual findings unless clearly erroneous, *Schickner v. Schnicker*, 237 Ariz. 194, 197, ¶ 13 (App. 2015) (citing *City of Tucson v. Clear Channel Outdoor, Inc.*, 218 Ariz. 172, 189, ¶ 58 (App. 2008)), we are not bound by its conclusions of law, *Alley v. Stevens*, 209 Ariz. 426, 428, ¶ 6 (App. 2004). "A factual finding is clearly erroneous if no substantial evidence supports it." *Schickner*, 237 Ariz. at 197-98, ¶ 13 (quoting *City of Tucson*, 218 Ariz. at 189, ¶ 58).

II.     *Wife's Appeal*

A.  *Spousal Maintenance*

**¶18**        Wife argues the decree erred in awarding spousal maintenance to Husband.

**¶19**        We review an award of spousal maintenance for an abuse of discretion. *Helland v. Helland*, 236 Ariz. 197, 202, ¶ 22 (App. 2014). In our review, we accept the family court's factual findings unless they are clearly erroneous or unsupported by credible evidence. *Federoff v. Pioneer Title & Trust Co. of Ariz.*, 166 Ariz. 383, 388 (1990).

**¶20**        The determination of spousal maintenance is controlled by A.R.S. § 25-319. Before awarding spousal maintenance, the family court must first consider whether a spouse meets the statutory requirements for maintenance set out in A.R.S. § 25-319(A). *Gutierrez v. Gutierrez*, 193 Ariz. 343, 348, ¶ 15 (App. 1998). If any of the factors in § 25-319(A) is present, the court may award spousal maintenance. *Cullum v. Cullum*, 215 Ariz. 352, 354, ¶ 11 (App. 2007).

**¶21**        The court must next consider the statutory factors of § 25-319(B). In determining the amount and duration of spousal maintenance, the court must consider the receiving spouse's ability to earn income in light of some reasonable approximation of the standard of living established during the marriage. *Thomas*, 142 Ariz. at 391. At the same time, the court should aim "to achieve independence for both parties and to require an effort toward independence by the party requesting maintenance." *Schroeder v. Schroeder*, 161 Ariz. 316, 321 (1989); *see also Rainwater v. Rainwater*, 177 Ariz. 500, 503 (App. 1993) ("[M]aintenance orders, whenever possible, should promote a transition toward financial independence.").

**¶22**        Wife argues the decree is clearly erroneous and constitutes an abuse of discretion by awarding $8,000 per month in spousal maintenance

for almost six more years (approximately $560,000) after she had already paid $314,000 in voluntary and court-ordered spousal maintenance for approximately five years pending the dissolution decree. *See generally Roden v. Roden*, 190 Ariz. 407, 411 (App. 1997) (stating that the trial court correctly considered the "over $100,000 in temporary support" received by the wife during pendency of the dissolution petition as a reason to deny spousal maintenance), *superseded in part by statute on other grounds as recognized in Myrick v. Maloney*, 235 Ariz. 491, 494, ¶ 8 (App. 2014). Wife does not dispute that Husband contributed to her educational opportunities and that, under § 25-319(A), the family court had discretion to award Husband *some* spousal maintenance for this reason alone. *See* A.R.S. § 25-319(A)(3). Nonetheless, she argues that the stated purpose for spousal maintenance—achieving independence—had been achieved once Husband received his MBA and had sufficient time to establish greater earning potential.

**¶23** In awarding spousal maintenance to Husband, the family court found Husband had been "allocated a sufficient amount of property in this decree that he has sufficient property to provide for his reasonable needs for several years because the community estate is relatively sizeable." The court also recognized that, pending the divorce, Husband had received his MBA, and he had approximately two-and-a-half years both before and after receiving the degree to find a job, leading the court to conclude that Husband's "income potential with an MBA is significantly higher than he is earning," that Husband "could find a local job that paid better than his current job," and that Husband "has adequate earning ability in the labor market that would allow him to be self-sufficient." Although the court also correctly found the parties' standard of living had grown significantly during the latter years of their marriage, and Wife's demonstrated earning ability was significantly greater than Husband's, the court additionally found that, "with the division of community assets, [Husband] is currently able to meet his own needs independently." Husband acknowledges the court found he "was fully capable of supporting his own independence."

**¶24** After reviewing the record, the analysis of the factors in § 25-319, and the parties' arguments, we conclude Wife has shown the decree clearly erred in not only awarding Husband spousal maintenance for an additional six years, but also at the same time substantially increasing the amount of spousal maintenance. In ordering the award, the decree found that "[t]he time until May 31, 2022 will allow [Husband] the time that he needs to gain sufficient experience to improve his earning potential, and to secure improved employment." The decree does not explain the basis for this finding, except to state that "[i]t will also be the time when [the parties'

daughter] will have emancipated." Wife argues the record provides no basis for this time frame, and we agree. The record presented simply does not support the need for an additional six years of spousal support. Further, the decree does not explain at all the need for increasing the amount of spousal support previously awarded Husband through temporary orders.

¶25 Husband provides no record support for the decree's finding and no cogent argument in support of it. Instead, Husband focuses largely on his belief that Wife "had the ability to pay" him an even larger amount of spousal maintenance for a longer period of time; that, in 1999, the parties agreed Husband "would then become a stay-at-home dad" with their child who is now an adult; and that the decree did not award Husband "sufficient property to meet his own needs independently." These arguments, however, are not based on the statutory language of A.R.S. § 25-319(B) as written. Nor do they address, in any meaningful way, Husband's earning ability after completing his MBA or his financial resources, including the more than $570,000 awarded him in the decree, above and beyond the nearly $375,000 he received pending the divorce.

¶26 By the time of the dissolution decree, Husband had approximately five years to obtain his MBA degree and then find work commensurate with his education and experience. Affording Husband some additional time to further establish himself—as he has now had to date since the decree—arguably might have been supportable on this record and would certainly have adequately addressed Husband's needs, given Husband's previous work experience and the decree's findings that Husband is fully capable of supporting himself and has sufficient property to provide for his needs independently. In this case, however, the decree ordered an additional six years—for a total of eleven years—of spousal maintenance with no supportable justification. Husband's calculated decision to effectively "under-employ" himself pending (and potentially after) the divorce is a burden that should not continue to be borne by Wife. *Cf. Thomas*, 142 Ariz. at 391 (recognizing that a spouse is not to be forced by the judgment of the trial court into seeking *any* employment, but must seek "appropriate" employment). Moreover, the decree also should have considered the income-earning capabilities of the Lakeland and Holly homes, both of which were awarded to Husband. *See Cullum*, 215 Ariz. at 355, ¶ 13 (recognizing a court should consider the income potential of property received by a spouse seeking maintenance (citing *Deatherage v. Deatherage*, 140 Ariz. 317, 321 (App. 1984))); *Kelsey v. Kelsey*, 186 Ariz. 49, 53 (App. 1996) (recognizing the income-producing potential of property

awarded a spouse "is a 'financial resource' to be considered pursuant to A.R.S. § 25-319(B)(9)" (citing *Rainwater*, 177 Ariz. at 502)).

¶27 Coupled with the significant property received by Husband in the dissolution decree, the spousal support received from Wife during pendency of the petition enabled Husband to earn his MBA, establish a career, and become financially self-sufficient and independent. The decree's award of an additional six years' worth of increased spousal maintenance is clearly erroneous, is not supported by its findings, and cannot stand. Accordingly, we vacate the award of spousal maintenance and remand for the family court to reconsider spousal maintenance in light of the decree's findings, the apparent lack of record support for increased maintenance, and the goal of spousal maintenance—achieving independence for both parties while requiring an effort toward independence by the party requesting maintenance. *See Schroeder*, 161 Ariz. at 321.[2]

### B. Business Valuation

¶28 Wife also argues the court abused its discretion in finding that AEMS and MP Butler were separate businesses for valuation purposes. Wife does not dispute that AEMS is her business and should be valued, but she maintains MP Butler is merely a bank account, or holding company, that receives the income she earns for her work with AEMS and pays out taxes. As support for her argument, Wife notes MP Butler has no assets, office, or supplies and derives its income from AEMS.

¶29 In concluding that MP Butler should be valued separately from AEMS, the court reasoned as follows:

> [Wife] argues that MP Butler is simply a bank account used for tax purposes where wages are simply passed through from AEMS to [Wife]. Technically this is not correct. [Wife]'s wages from AEMS were reported as such in her 2011 tax return, and were separate from partnership income [Wife] received from AEMS. It is also clear that the income used in

---

[2] Our resolution of this issue also addresses Wife's apparent but largely undeveloped "double-dipping" argument regarding spousal maintenance that she intertwines with the business valuation argument she presents in the next section of her opening brief.

MP Butler's tax returns did not involve the business income that was paid to [Wife] from AEMS because that income was declared on [Wife]'s personal taxes for 2011. [Wife] testified that MP Butler receives income from Tizon, AEMS and KEA.[3] The Court concludes that all income that MP Butler received in 2011 was from 1099s.

In the parties' 2012 income tax return, [Wife]'s basis in (or cost paid into) MP Butler, PLLC was $81,287.

The Court concludes it is proper to provide a value to MP Butler because it generates income like any other business. If it were not incorporated, [Wife] would have a sole proprietorship that would still have a value. For this reason, the Court concludes that it would have needed to value the business even if [Wife] had not incorporated MP Butler.

(Internal record citations omitted.)

¶30 The extensive testimony of Husband's business evaluation expert, Lynton Kotzin, supports the court's conclusion. Kotzin testified that "each company gets valued on a stand-alone basis based on its underlying profitability, cash flow, and risk profile . . . , [and] the value of those two entities [AEMS and MP Butler] is essentially . . . independent." Kotzin further explained that, in valuing both AEMS and MP Butler, he "made sure that we weren't . . . double counting." The record makes clear that AEMS and MP Butler are two distinct legal entities and that each has independent value. The family court did not abuse its discretion in separately valuing AEMS and MP Butler.

### C. Credits for Payments on the Remuda Home

¶31 Wife also argues the family court abused its discretion in failing to provide her with an offset credit for payments she made to service the mortgage and for other expenses on the Remuda home. She maintains the loans on the Remuda home were "interest-only," and the court erred in concluding that, "since [Wife] is being awarded the Remuda house, any expenses [she] paid for the mortgages or to upkeep the house simply reduced the upside[-]down equity in the property." Wife argues, "As a

---

3 AEMS is a parent company of Tizon Emergency Associates, P.L.L.C. and Kingman Emergency Associates, P.L.L.C.

matter of law (to say nothing of math) Wife's interest only payments neither increased nor decreased the equity in the Remuda property."

¶32 Wife provides no authority for her argument, which is based on semantics. In commenting on the payments, the family court simply and correctly recognized that any failure to keep up the home would reduce its value, and the failure to make payments on the mortgages would have additional negative financial consequences. Moreover, as the court noted, Wife's documentation contained inaccuracies, and the court found that much of the supporting documentation she provided was "illegible." The record supports these conclusions and, for this reason alone, the court did not abuse its discretion in failing to credit Wife for payments she made on the Remuda home. Finally, although not argued by Husband, it appears the court similarly did not provide an offset credit to Husband for any payments he made to the Oakwood home, which he ultimately received.

### III. Husband's Cross-Appeal

### A. Orders Regarding the Remuda Home

¶33 On cross-appeal, Husband argues the family court erred in not considering the possibility that Wife might short sell the Remuda home, and in subsequently authorizing the Clerk of the Court to sign any deeds necessary to transfer the Remuda home to Wife.

¶34 As part of the dissolution decree, the court expressly acknowledged the negative equity in the Remuda home and ordered Wife to either refinance the loans on the home to remove Husband's name from them within one year of the date of the decree, or to sell the home. The court also noted its awareness of Wife's testimony that, "because of the [home's] upside[-]down equity, no one is willing to refinance the house."

¶35 Because the mortgages for the Remuda home were in both parties' names, Wife contacted Husband to obtain his assistance to comply with the court's order, but the parties were unable to reach a resolution. Husband filed a petition to enforce the decree, and Wife eventually moved for a court order to allow her to comply with the terms of the decree. On June 14, 2017, the court held a hearing on the issue, and ordered that the Clerk of the Court could sign any deed necessary to transfer real property into the name of the spouse awarded it. Accordingly, the court's order allowed the deed to the Remuda home to be in Wife's name only, and the court left in place its previous order that Wife either refinance or sell the home.

¶36 Husband argues the court's order negatively impacts his credit and may allow Wife to be unjustly enriched. He provides no offer of proof or citation to the record to support either claim, however, and his argument is largely undeveloped, with no supporting legal citation. We also have found no legal authority supporting Husband's argument, and as the family court clearly recognized, its order was in furtherance of and did not modify the decree. *See Elizabeth W. v. Georgini*, 230 Ariz. 527, 529, ¶ 8 (App. 2012) (recognizing that a trial court retains the inherent power to ensure its orders are followed); *see also Fenton v. Howard*, 118 Ariz. 119, 121 (1978) ("Every court has inherent power to do those things which are necessary for the efficient exercise of its jurisdiction." (citation omitted)). It was within the family court's authority to divide the community property equitably, *see* A.R.S. § 25-318(A), and on this record, Husband has demonstrated no abuse of discretion.

### B. Community's Interest in Excess Contributions/Distributions

¶37 Citing *Schickner*, Husband argues the family court erred in failing to address any community interest in excess distributions above Wife's reasonable compensation regarding AEMS and MP Butler. *See* 237 Ariz. at 199-201, ¶¶ 21-30. Husband's argument in effect is that the distributions of those community businesses exceeded Wife's reasonable compensation and therefore necessarily included passive income; Wife failed to show by clear and convincing evidence that all post-petition distributions from AEMS and MP Butler were the result of Wife's toil and labor, and thus her sole and separate property; and the court therefore should have awarded him one-half of any excess distributions.

¶38 Husband waived this issue. During trial, Wife objected that Husband had not disclosed this specific issue in any Pretrial Statement. Further, Husband did not raise this issue in his motion for new trial. As a general rule, a party cannot argue on appeal legal issues not properly raised with the trial court. *Cullum*, 215 Ariz. at 355 n.5, ¶ 14 (citing *McDowell Mountain Ranch Land Coal. v. Vizcaino*, 190 Ariz. 1, 5 (1997)).

¶39 Even assuming Husband did not waive this issue, however, his reliance on *Schickner* is unavailing. In *Schickner*, it was undisputed that, "even if Husband did not work for the [community] businesses, he nonetheless would have been entitled to claim whatever profits or losses were generated by [those businesses]." 237 Ariz. at 200, ¶ 29. Here, however, Wife presented evidence from which the family court could have concluded that she does not have a contractually set base salary, and that all post-service distributions she received for her professional services were

the result of her individual toil and labor and constituted reasonable compensation for such. The family court acted within its discretion when it made no division of Wife's post-service income and profits.

**¶40** Moreover, the record makes clear the family court was aware of the *Schickner* case. Husband's expert, Kotzin, testified that, in valuing the community businesses, he used an "excess earnings methodology under the income approach," and he went on to explain that in *Schickner*, this court had remanded the case "for determination of what the distributions in excess of reasonable compensation were from the date of service through the date of decree." Kotzin also testified regarding distributions that purportedly exceeded reasonable compensation. We presume the court fully considered the evidence in light of *Schickner*, even though that decision is not specifically mentioned in the decree. *See Fuentes v. Fuentes*, 209 Ariz. 51, 55-56, ¶ 18 (App. 2004) ("[T]he foregoing evidence is presumed to have been fully considered by the court prior to issuing its decision." (citing *Able Distrib. Co. v. James Lampe, Gen. Contractor*, 160 Ariz. 399, 409 (App. 1989))).

     *IV.    Costs and Attorneys' Fees on Appeal*

**¶41** Both parties request costs and attorneys' fees on appeal pursuant to A.R.S. § 25-324(A). Although Wife has greater demonstrated earning capability, both sides have considerable financial resources, and neither side has demonstrated unreasonableness on appeal. Accordingly, in the exercise of our discretion, we deny both parties' requests for attorneys' fees. As the more successful party on appeal, Wife is awarded her taxable costs, subject to compliance with Rule 21, ARCAP.

## CONCLUSION

**¶42** We vacate the award of spousal maintenance and remand for reconsideration of that issue, but otherwise affirm the family court's dissolution decree.



AMY M. WOOD • Clerk of the Court
FILED: AA